RHODA DEAS *vs.* BARBARA DEMPSEY.

Suffolk. September 12, 1988. — December 7, 1988.

Present: HENNESSEY, C.J., WILKINS, LIACOS, NOLAN, & LYNCH, JJ.

*Civil Rights*, Coercion.

In an action brought under G. L. c. 12, § 11I, the Massachusetts Civil
Rights Act, the plaintiff did not demonstrate that the defendant's alleged
negligent acts amounted to coercive conduct intended to deprive the
plaintiff of her civil rights, thus the judge correctly allowed the defend-
ant's motion for summary judgment. [470-472] LYNCH, J., concurring.

CIVIL ACTION commenced in the Superior Court Department
on October 20, 1981.

The case was heard by *Guy Volterra*, J., on a motion for
summary judgment.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*Steven W. Phillips* (*Charlotte H. Harrison* with him) for the
plaintiff.

*William L. Pardee*, Assistant Attorney General, for the de-
fendant.

NOLAN, J. The sole issue here is the correctness of the trial
judge's allowance of the defendant's motion for summary judg-
ment. This resulted in dismissal of the plaintiff's complaint
which sought to make out a case under the Massachusetts Civil
Rights Act, G. L. c. 12, § 11I. We transferred the plaintiff's
appeal to this court on our own motion. There was no error.

The test whether a motion for summary judgment should be
allowed is twofold: whether there exists a genuine issue of
material fact after consideration of the pleadings, depositions,
answers to interrogatories and affidavits; and whether the mov-
ing party is entitled to judgment as a matter of law. Mass. R.
Civ. P. 56(c), 365 Mass. 824 (1974).

The plaintiff, Rhoda Deas, a mother of seven children, was a welfare recipient who participated in a rent payment program administered by the Department of Public Welfare (department) and known as "protective rent," by which a portion of her bi-monthly welfare check was paid directly to her landlord, Tenant Services, Inc., and deducted from her check. In January, 1978, the landlord's property manager wrote to Deas, advising her that rental payments made under the protective rent program would no longer be accepted. A copy of this letter was sent to the department. Deas conferred with the property manager and she concluded that the landlord had rescinded the terms of its letter to her and that it had agreed to continue to receive her rent under the protective rent program. The landlord's agent told her to let her caseworker know of this arrangement. Deas claims to have notified her caseworker, the defendant, Barbara Dempsey, of the landlord's acquiescence in continuing to accept protective rent. She also claims that Dempsey reassured her that there would be no problem in continuing payment under the protective rent program.

In the following month, Deas's welfare check contained an increase which reflected both a cost-of-living adjustment and an amount for rent which previously had been paid directly to Deas's landlord under the protective rent system. Deas claims that she was not aware of the reasons for the increase. In August, 1978, Deas received a notice that a default judgment had been entered against her in the landlord's eviction proceedings for nonpayment of rent.

Deas claims that she showed Dempsey this notice and Dempsey told her that she would clear up any misunderstanding with the Department and that she would try to reinstitute protective rent for her. Dempsey initiated the paperwork necessary to reinstate Deas in the protective rent program, but did not obtain the necessary authorization from Deas which was prerequisite to reinstatement of her protective rent status. On October 20, 1978, Deas was evicted from her home and some of her children were separated from her and from each other for a time. Deas complains that Dempsey did not advise her of

her rights and that she did not advise her of her eligibility for emergency assistance funds to pay the arrearage of rent.

To sustain her burden under G. L. c. 12, § 11I,[1] Deas must demonstrate that Dempsey has interfered or attempted to interfere with the exercise or enjoyment of rights secured by the United States Constitution, laws of the United States, the Massachusetts Constitution, or laws of the Commonwealth through threat, intimidation or coercion. G. L. c. 12, § 11H. See *Appleton* v. *Hudson*, 397 Mass. 812, 817 (1986).

Although civil rights statutes should be liberally interpreted to accomplish their remedial purposes, *Batchelder* v. *Allied Stores Corp.*, 393 Mass. 819, 822 (1985) (*Batchelder II*), the court's primary function in interpreting any statute is to ascertain the "intent of the Legislature, as evidenced by the language used, and considering the purposes and remedies intended to be advanced." *Glasser* v. *Director of Div. of Employment Sec.*, 393 Mass. 574, 577 (1984). In *Batchelder II*, we noted that the Legislature passed the Act to remedy the deprivation of civil rights caused by private parties and, to achieve that end, it eliminated the State action requirement. *Id.* at 822. But, as we recognized in *Bell* v. *Mazza*, 394 Mass. 176, 182 (1985), by reaching private party actions, the Legislature did not intend to create "a vast constitutional tort," and thus it limited recovery to those instances where the deprivation occurred by the defendant's "threats, intimidation or coercion."

While we determined in *Redgrave* v. *Boston Symphony Orchestra, Inc.*, 399 Mass. 93, 99 (1987), that specific intent is unnecessary to raise a valid claim under the Act, we have never directly confronted whether negligence standing alone can constitute coercion and thus give rise to a valid claim under the Act. *Breault* v. *Chairman of the Bd. of Fire Comm'rs of Springfield*, 401 Mass. 26, 36 n.12 (1987), cert. denied sub nom. *Forastiere* v. *Breault*, 485 U.S. 906 (1988). In *Breault, supra*, we did say, however, that §§ 11H and 11I operate "almost entirely within the realm of 'intentional' behavior." *Id.*

---

[1] General Laws c. 12, §§ 11H, 11I , inserted by St. 1979, c. 801, § 1, were not in effect when Deas was evicted from her home. However, no argument was advanced in the trial court on this ground.

at 36. In a gloss to this statement quoting Restatement (Second) of Torts § 8A (1965), we indicated that "intentional" is used in the tort sense to mean "that the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it." *Id.* at n. 12.

Webster's New International Dictionary at 519 (2d ed. 1959) defines coercion as: "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done."

Deas has failed to show that Dempsey's failure to protect her rights amounted to coercion (clearly, there were no threats or intimidation). At worst, Dempsey's conduct amounted to negligence (if we accept as true all of Deas' allegations). Although Dempsey's actions may have induced reliance by Deas, absent an affirmative showing of Dempsey's intent to cause the deprivation of Deas' constitutional rights or the belief that such a deprivation was substantially certain to result, Dempsey's conduct does not rise to the level of coercion. In discussing the element of coercion in *Pheasant Ridge Assocs. Ltd. Partnership* v. *Burlington*, 399 Mass. 771, 781 (1987), we concluded that the defendant town's action of taking property in bad faith failed to satisfy the statutory requirement of coercion because it was "an attempted direct, preemptive act and did not seek to coerce any plaintiff to do or not to do anything." While Deas, relying on Dempsey's assurances, refrained from acting on her rights, she has not shown that Dempsey, by her inaction, ever sought to coerce Deas "to do or not to do anything."

Negligence is a concept distinct from intentional conduct. In fact, its definition excludes intentional conduct. It would seem that the Legislature's use of such terms as "coercion," "threats" and "intimidation" expresses an intention to require intentional conduct.

Without ruling that "coercion" may never in any circumstances arise out of negligence, we conclude that the defendant's conduct, as demonstrated by the materials before the judge, fell far short of the type of intentional, coercive conduct that the Legislature intended to protect against when it created

the Act. Indeed, to reach a contrary conclusion in this instance would serve only to create the "vast constitutional tort" which the Legislature so carefully sought to avoid. See *Bell* v. *Mazza*, *supra*.

In conclusion, the plaintiff has failed to demonstrate a genuine issue of material fact on the required element of coercion. Accordingly, the motion for summary judgment was properly allowed.

*Judgment affirmed.*


LYNCH, J. (concurring). Since I believe that a plaintiff's right of recovery under G. L. c. 12, § 11I, requires a showing of the defendant's specific intent, *Redgrave* v. *Boston Symphony Orchestra, Inc.*, 399 Mass. 93, 102 (1987) (O'Connor, J., dissenting), I agree that summary judgment for the defendant was properly allowed.