JEFFREY BUSTER, individually and as trustee,[1] & others[2] *vs.*
GEORGE W. MOORE, INC., & others.[3]

Middlesex. October 7, 2002. - February 11, 2003.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, & CORDY, JJ.

*Civil Rights,* Availability of remedy, Coercion. *Statute,* Construction. *Mortgage,* Foreclosure. *Negotiable Instruments,* Note. *Consumer Protection Act,* Unfair or deceptive act. *Contract,* Interference with contractual relations, Settlement agreement. *Practice, Civil,* Discovery, Stipulation. *Privileged Communication. Evidence,* Privileged communication. *Attorney at Law,* Attorney-client relationship, Work product.

In a civil action in which the plaintiffs, a trustee and two beneficial owners of a real estate trust, alleged that the defendants violated the Massachusetts Civil Rights Act, G. L. c. 12, §§ 11H, 11I, and G. L. c. 93A, § 11, and intentionally interfered with their contractual and advantageous relations with one of the defendants, all in connection with a real estate dispute, there was sufficient evidence to support the judge's findings that the plaintiffs were "hopelessly in default," and that "there was no serious prospect that they could either remedy their default or cease further events of default"; in addition, the judge's credibility determinations were amply supported and consistent. [642-644]

This court concluded that economic coercion, in the absence of actual or potential physical coercion, may, in certain circumstances, constitute "threats, intimidation or coercion" within the meaning of the Massachusetts Civil Rights Act, G. L. c. 12, §§ 11H, 11I. [644-648]

In a civil action in which the plaintiffs, a trustee and two beneficial owners of a real estate trust, alleged that the defendants violated the Massachusetts Civil Rights Act, G. L. c. 12, §§ 11H, 11I (act), in connection with a real estate dispute, the judge did not err in entering judgment against the plaintiffs, where economic loss occasioned by the plaintiffs' own conduct in defaulting on a note and mortgage was beyond the bounds of economic coercion under the act. [648-649]

In a civil action in which the plaintiffs, a trustee and two beneficial owners of a real estate trust, alleged that the defendants violated G. L. c. 93A, § 11, in connection with a real estate dispute, the judge's dismissal of the plaintiffs' claim was fully supported by the record, where the defendants' purchase of a note and mortgage and foreclosure on the plaintiffs' property,

---

[1]Of 110 Beaver Street Trust.

[2]Martha Eakin and Paul McGinty.

[3]Goffe, Inc.; Duffy Brothers Management Co., Inc.; Norman J. Duffy; Robert L. Duffy; and Kevin Duffy.

resulting in a legitimate advantage to weaken the plaintiffs' economic position, did not lead to a conclusion that the defendants acted unfairly or deceptively, particularly in that the plaintiffs' business vulnerabilities were clearly the result of their own conduct, and where there was no dispute that real estate owned by the plaintiffs, upon which the defendants had instigated regulatory action, was in violation of fire and safety codes, or that the resulting inspections were proper and accurate. [649-652]

In a civil action in which the plaintiffs, a trustee and two beneficial owners of a real estate trust, alleged that the defendants intentionally interfered with their contractual and advantageous relations with one of the defendants, in connection with a real estate dispute, the judge properly entered judgments for the defendants, where no showing was made that the defendants knowingly and for an improper purpose or by improper means induced a party to breach a contract or not to enter into or continue a business relationship, resulting in damage. [652-653]

There was no merit to contentions by plaintiffs in a civil action that the judge erred in denying their pretrial motions to compel production of certain documents withheld on the basis of the attorney-client privilege or the work-product doctrine, absent a showing by the plaintiffs that the judge abused his discretion such that prejudicial error resulted. [653-655]

On a counterclaim alleging that the plaintiffs in an action arising from a real estate dispute breached a contract and violated G. L. c. 93A by repudiating a settlement stipulation entered in certain bankruptcy proceedings, the judge properly allowed the plaintiffs' motion for summary judgment in circumstances in which an award of damages under c. 93A would have resulted in an unfair windfall. [655-656]


CIVIL ACTION commenced in the Superior Court Department on February 4, 1997.

The case was heard by *Ralph D. Gants*, J., and a motion for reconsideration was heard by him; a counterclaim was also heard on motions for summary judgment.

The Supreme Judicial Court granted an application for direct appellate review.

*David J. Fine* for Jeffrey Buster & others.

*Paul Killeen* (*Edward J. Naughton* with him) for the defendants.

*Andrew G. Lizotte*, for Harold B. Murphy, was present but did not argue.

MARSHALL, C.J. In this factually complex case, we are asked to consider, among other issues, whether economic coercion, in the absence of actual or potential physical coercion, may in any circumstance constitute "threats, intimidation or coercion"

within the meaning of the Massachusetts Civil Rights Act, G. L. c. 12, §§ 11H, 11I (act).[4] We conclude that economic coercion alone may constitute "threats, intimidation or coercion" in violation of the act, but that the plaintiffs have failed to demonstrate such actionable coercion in this case. We affirm the Superior Court's judgments and orders with regard to all matters appealed from by the plaintiffs and by one defendant.

1. *Background.* The plaintiffs and one defendant, Goffe, Inc. (Goffe), appeal from judgments and orders entered by a Superior Court judge. The plaintiffs, a trustee and two beneficial owners of a real estate trust, filed an amended complaint alleging that the defendants Goffe; Duffy Brothers Management Co., Inc.; and Norman J. Duffy, Robert L. Duffy, and Kevin Duffy (Duffys) violated the act (Count II) and G. L. c. 93A, § 11 (Count III), and intentionally interfered with their contractual and advantageous relations with the defendant George W. Moore, Inc. (Moore) (Counts VII and VIII), all in connection with a real estate dispute.[5] Goffe counterclaimed that the plaintiffs committed a breach of a settlement stipulation entered into with Goffe in certain bankruptcy proceedings and that the plaintiffs' reneging on the agreement was an unfair or deceptive business practice in violation of G. L. c. 93A.

On April 27, 2000, after conducting an eight-day jury-waived trial on the issues of liability, a Superior Court judge issued a lengthy memorandum that made extensive findings of fact and conclusions of law and entered an order for judgment for the defendants on all four of the plaintiffs' claims. The plaintiffs

---

[4]General Laws c. 12, § 11I, provides that "[a]ny person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with, as described in [§] 11H, may institute and prosecute in his own name and on his own behalf a civil action for injunctive and other appropriate equitable relief." Section 11H proscribes behavior by "any person or persons, whether or not acting under color of law, [interfering] by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States or of rights secured by the constitution or laws of the commonwealth."

[5]A judge in the Superior Court had earlier dismissed Count I, which alleged violations of the "anti-SLAPP" statute, G. L. c. 231, § 59H. The plaintiffs have not challenged this ruling. The parties agreed that Counts IV, V, and VI were properly severed from this action.

filed a motion for reconsideration on, among other things, the
ground that two decisions issued after the judge's order, *Brunelle*
v. *Lynn Pub. Schs.*, 433 Mass. 179 (2001), and *Kattar* v. *De-
moulas*, 433 Mass. 1 (2000), demonstrated error in certain of
the judge's key conclusions of law. On July 24, 2001, the judge
denied the plaintiffs' reconsideration motion and allowed the
plaintiffs' motion for summary judgment on both counts of Gof-
fe's counterclaim. On October 9, 2001, the judge entered partial
final judgments on both the plaintiffs' claims described above
and Goffe's counterclaim.

In addition to appealing from both the April, 2000, and the
October, 2001, judgments, the plaintiffs appeal from the judge's
pretrial discovery order denying their motion to compel, the
order denying two motions to make additional findings of fact
and amend the judgment, and the order denying the plaintiffs'
reconsideration motion. Goffe appeals from the adverse sum-
mary judgment ruling. We granted the plaintiffs' application for
direct appellate review.

2. *Facts.* We summarize the judge's findings of fact,
supplementing these findings with undisputed material of record
where necessary. We reserve some details for later discussion.

(a) *The parties and the properties.* Beginning in 1973, the
defendants began to acquire property on Waverly Oaks Road in
Waltham, and by 1996, they had purchased enough land to
build a retail shopping center, to be located at 313 Waverly
Oaks Road. One of the pieces of the Duffys' Waverly Oaks
Road land abutted the plaintiffs' property, located at 110 Beaver
Street.[6] The plaintiffs' property contained two buildings that the
plaintiffs sought to develop as commercial rental property.

Before the Duffys could begin developing the shopping
center, which was on land designated as a wetlands site, they
were required to obtain an "order of conditions" (essentially a
permit) from the conservation commission of the city of
Waltham (commission). See G. L. c. 131, § 40. As part of this
permitting process, the Duffys were statutorily required to notify

---

[6]The 110 Beaver Street property was owned by the 110 Beaver Street Trust
(trust). The plaintiff Jeffrey Buster was the trustee. The beneficial owner of the
trust was the 110 Beaver Street Partnership, the partners in which were the
plaintiffs Martha Eakin (Buster's wife) and Paul McGinty.

all abutters, including the plaintiff Jeffrey Buster about the proposed work. Buster attended all four hearings the commission held to consider the Duffys' development proposals. At the hearings, Buster objected to the proposed development because, he asserted, the project would adversely affect the flood storage capacity of the Duffys' Waverly Oaks Road property and subsequently the trust's property. The judge found that Buster "devoted a considerable amount of time, effort, and money to persuade the [commission] to deny the [o]rder of [c]onditions." However, after conducting two site visits and hearing testimony from its own consultant, the commission voted unanimously to issue the order of conditions.

Buster appealed from the commission's order of conditions to the Department of Environmental Protection (department). The department accepted the appeal and sent a letter to the Duffys ordering them not to commence their project until a superseding order of conditions had issued and all relevant appeals periods had lapsed. See G. L. c. 131, § 40. The judge found, and the parties do not dispute, that the department appeals process would have taken approximately two to three years to complete.[7] Buster also filed a complaint in the Superior Court requesting that the order of conditions be vacated.

(b) *Goffe's purchase of the promissory note and mortgage.* The Duffys were convinced that Buster's appeal was frivolous and an attempt at "economic blackmail," although Buster insisted otherwise. At about the time that Buster filed the appeal with the department and the lawsuit, the Duffys received information that the plaintiffs' 110 Beaver Street property was "in trouble." They learned that Moore held a promissory note from Buster, as trustee of the 110 Beaver Street Trust, secured by a mortgage on the property at 110 Beaver Street, that Buster was in default of the note and his mortgage payments under the note, and that there were actual or potential tax, zoning, and environmental problems with the property. The Duffys, through the Duffy-held entity Goffe, purchased the note and mortgage

---

[7] The judge found that the department's appeal process "injured" the Duffys by, at a minimum, delaying construction of the project, making it harder to market the project to prospective tenants, tying up their investment funds, and causing them to expend time and resources to defeat the appeal.

from Moore in November, 1996.[8] The judge found that, while "admittedly a close question," the Duffys' primary purpose in acquiring the note and mortgage was to "induce" Buster to withdraw his appeal and his lawsuit. The judge also found, however, that the Duffys recognized that purchasing the mortgage was, in and of itself, a "sound business" move.

In the judge's words, Buster "immediately recognized" that the Duffys' acquisition of the note and mortgage "was not good news." After learning of the transaction, the plaintiffs requested a meeting with the Duffys to discuss the status of the property. At the meeting, the plaintiffs asked the Duffys for financing, and Buster initiated discussion about the appeal, proposing that the Duffys pay for a dam on Federal property across the street from 313 Waverly Oaks Road as a way to resolve his flood storage concerns. The Duffys told Buster that, although they did not own this property, they would look into the idea of a dam. They also requested that the plaintiffs put together a business plan detailing their plans to cure the default.

At a subsequent meeting, however, the plaintiffs, represented by Buster and McGinty, put forward no such plan. When it became clear to the Duffys that Buster did not intend to offer a settlement proposal, the Duffys presented Buster and McGinty with two options. Under the "buy-out" option, Buster would execute a deed transferring the property to the Duffys and would withdraw both the appeal to the department and the Superior Court action. In return, the Duffys would pay Buster and the trust $100,000 in three instalments, with the last payment of $50,000 due "six months after the foreclosure if there were no further challenges to the Duffys' plans for the shopping center development." Under the "forbearance" option, Buster would keep the property, sign a forbearance agreement, enter in a payment plan crafted by the Duffys, and withdraw the department appeal and the Superior Court action.[9] Buster and McGinty rejected both options. The Duffys decided to pursue foreclosure.

---

[8]The Duffys paid Moore $300,000 and also agreed to pay off Internal Revenue Service and real estate liens on the property.

[9]Under this option, the judge found Buster could defer "three mortgage payments in 1997 . . . and the mortgage payments and real estate taxes that were in arrears . . . for 59 months, at 9.5 percent interest, until December 1, 2001 [five years later], when a lump sum payment of $340,404.85 would be

(c) *Foreclosure, bankruptcy, and inspection.* The initial foreclosure sale was scheduled for February 7, 1997.[10],[11] However, on or just before that date, the plaintiffs filed for bankruptcy protection under chapter 11 in the United States Bankruptcy Court for the District of Massachusetts, thereby triggering an automatic stay of the foreclosure auction.[12] Goffe subsequently filed a motion in the Bankruptcy Court to lift the stay.

While Goffe's motion was pending before the Bankruptcy Court, the Duffys met with the mayor of Waltham to persuade the city to inspect the 110 Beaver Street property for fire and safety violations, a request they had made in vain at least three months earlier to the city's deputy fire chief. In the wake of the meeting with the mayor, an inspection took place that revealed many serious fire and safety violations on the property and the fact that the property had been "buil[t] out" and leased to tenants without the proper building permits and certificates of occupancy. On June 24, 1997, the city's building commissioner issued a cease and desist order, ordering Buster to stop all construction work and to cease and desist all occupancies at 110 Beaver Street.

On July 23, 1997, one day before the scheduled hearing on Goffe's motion for relief from the stay, the 110 Beaver Street Partnership and Goffe filed a handwritten settlement stipulation in the Bankruptcy Court. In the stipulation, as the Superior Court judge found, Goffe agreed inter alia "to reduce its claim on the outstanding [n]ote, extend the plaintiffs' payment schedule, and forbear from foreclosure in return for the plaintiffs' dismissal of all litigation and administrative proceed-

---

due. Mortgage payments that came due (apart from the first three in 1997) would continue to be paid as provided in the [n]ote."

[10]Due to a miscommunication, Moore's attorneys, who also represented the Duffys, had inadvertently filed a complaint to foreclose the mortgage on behalf of Moore a few days before the Duffys purchased the note and mortgage.

[11]On February 4, 1997, the plaintiffs filed the instant action and moved for a preliminary injunction staying the foreclosure sale. A judge in the Superior Court denied the motion.

[12]Buster attended the foreclosure sale and presented a facsimile notice to the auctioneer that the 110 Beaver Street Partnership had filed for bankruptcy protection, effectively terminating the sale.

ings, and execution of a release of all pending claims." Soon after entering in the stipulation on behalf of the plaintiffs, however, Buster sought to repudiate it. On August 25, 1997, a Bankruptcy Court judge approved the stipulation over Buster's objections, subsequently finding that, "Mr. Buster knowingly and voluntarily entered into the [s]tipulation upon the advice of competent counsel and is now estopped from objecting to the [s]tipulation." On October 8, 1997, the Bankruptcy Court judge allowed Goffe's motion for relief from the stay. Against this background, we turn to the issues on appeal.

3. *Review of findings of fact.* During eight days of trial, the judge heard often sharply conflicting testimony from ten witnesses and reviewed more than 175 exhibits. His thorough consideration of the evidence is reflected in almost thirty pages of findings of fact. The plaintiffs dispute several of these findings as "erroneous." Because the plaintiffs' challenges, if successful, might also invalidate the judge's conclusions of law, we review the findings as an initial matter.

We review the findings for clear error. Our review "is circumscribed by the deference [we] must give to decisions of the trier of fact, who is usually in a superior position to appraise and weigh the evidence." *Starr* v. *Fordham*, 420 Mass. 178, 186 (1995), quoting *First Pa. Mtge. Trust* v. *Dorchester Sav. Bank*, 395 Mass. 614, 621 (1985). We recognize that "[t]he judge's advantage in weighing the testimony is particularly evident in a case involving conflicting testimony, 'one in which widely differing inferences could be drawn from the evidence,' and the drawing of inferences cannot be separated from the evaluation of the testimony itself." *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 509-510 (1997), *S.C.*, 428 Mass. 543 (1998), quoting *Goddard* v. *Dupree*, 322 Mass. 247, 248 (1948). "[W]e shall not 'review questions of fact found by the trial judge, where such findings are supported "on any reasonable view of the evidence, including all rational inferences of which it was susceptible." ' " *Judge Rotenberg Educ. Ctr., Inc.* v. *Commissioner of the Dep't of Mental Retardation (No.1)*, 424 Mass. 430, 452 (1997), quoting *First Pa. Mtge. Trust* v. *Dorchester Sav. Bank, supra* at 624. "The inquiry is not whether we would have reached the same result as the judge

but rather whether, on the entire evidence, we are 'left with the definite and firm conviction that a mistake has been committed.' " *Commonwealth* v. *Source One Assocs.*, 436 Mass. 118, 124 (2002), quoting *Starr* v. *Fordham, supra* at 186. "The burden of proof rests on the appellant to show . . . an error." *Commonwealth* v. *Source One Assocs., supra.*

The plaintiffs contend that the judge was wrong to find that "Buster and the Partnership were hopelessly in default, and there was no serious prospect that they could either remedy their default or cease further events of default." This finding was amply supported by evidence that, at the time Goffe purchased the note and mortgage from Moore, the plaintiffs were in default of payments under the note, they had not paid real estate taxes on the property for approximately two years, there was a suit pending regarding alleged zoning violations on the property that had caused the city to refuse to issue building permits, and the property required environmental remediation work. The plaintiffs' testimony that they had plans to work themselves out of their fiscal dilemma by increasing the revenue from their properties does not undercut the judge's finding, particularly where the evidence showed that the plaintiffs' plans were predicated on such contingencies as Moore's continued tolerance of the plaintiffs' nonpayment of the mortgage and increased occupancy of the building in violation of existing codes.

The plaintiffs also argue that the judge viewed the defendants' evidence with insufficient "skepticism," and that, on the basis of his discounting some portions of the Duffys' testimony, the judge should have drawn the conclusion that the defendants "lied and lied repeatedly" about everything.[13] We disagree.

---

[13]Specifically, the plaintiffs claim that the judge should not have believed the Duffys' testimony concerning (1) how they became aware that the 110 Beaver Street was "in trouble"; (2) their beliefs that Buster's department appeal was frivolous and that Buster's objections to their development project "were not sincere"; and (3) the reasons for Kevin Duffy's initial pursuit of the fire-safety inspection of the 110 Beaver Street property. They argue, among other grounds, that the judge paid insufficient attention to the plaintiffs' evidence of the "good faith basis" the plaintiffs had for pursuing their appeal to the department and for filing their lawsuit, failed to take account of evidence "undermining the credibility" of the testimony of the Duffys' witnesses,

"Ordinarily, 'we will . . . not disturb the findings of a judge who saw and heard the witnesses, who was free to make credibility determinations and to accept all, some, or none of their testimony, unless there is a showing of clear error in those findings.' " *Commonwealth* v. *Mock,* 54 Mass. App. Ct. 276, 278 (2002), quoting *Commonwealth* v. *Scott,* 52 Mass. App. Ct. 486, 491 (2001). See *Fitch* v. *Ingalls,* 271 Mass. 121, 127 (1930) ("It is . . . well settled that testimony may be believed in part and disbelieved as to other parts"). The judge was free to credit and discredit portions of each party's testimony. We have carefully read the extensive evidentiary record in this case and conclude that the judge's credibility determinations are amply supported and consistent. We next turn to the plaintiffs' challenges to the judge's legal conclusions.

4. *The act.* To establish a claim under the act, the plaintiffs "must prove that (1) [their] exercise of enjoyment of rights secured by the Constitution or the laws of either the United States or the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.' " *Freeman* v. *Planning Bd. of W. Boylston,* 419 Mass. 548, 564, cert. denied, 516 U.S. 931 (1995), quoting *Bally* v. *Northeastern Univ.* 403 Mass. 713, 717 (1989).[14] As the judge aptly noted, "[t]he crux of this case focuses on the third element — whether the defendants' conduct constituted 'threats, intimidation or coercion' under the [act]." The plaintiffs claim that the judge erred in ruling both that actual or prospective economic harm alone can never form the kind of "threats, intimidation, or coercion" actionable under the act, and that, even if such conduct were actionable under the

ignored evidence that any code violations at 110 Beaver Street were not substantial, and did not "carry his insight into the Duffys' duplicity far enough."

[14]The judge concluded that, in this case, the first two elements were easily satisfied. "As to the first element," the judge explained that "there is no dispute that the plaintiffs' right to appeal is a right secured by the Constitution or laws of the Commonwealth." "As to the second element," the judge found that "the defendants purchased the [n]ote and [m]ortgage from Moore[] with the primary purpose of inducing Buster to withdraw these appeals," and the defendants do not dispute this finding.

statute, the plaintiffs' evidence was insufficient to support such a claim.[15] We consider each argument in turn.

Assessing the scope of the act is a question of statutory construction. Our "primary function in interpreting the [act] is to ascertain the 'intent of the Legislature, as evidenced by the language used, and considering the purposes and remedies intended to be advanced.' " *Bally* v. *Northeastern Univ., supra* at 718, quoting *Deas* v. *Dempsey*, 403 Mass. 468, 470 (1988). Because the act, "like other civil rights statutes, is remedial," it is "entitled to a liberal construction of its terms." *Batchelder* v. *Allied Stores Corp.*, 393 Mass. 819, 822 (1985).

The act is a product of that time in our nation's recent history when State and private actors often brought formidable, sometimes violent, pressure to bear against racial minorities seeking to exercise equal rights under the law. The Legislature enacted the statute "to provide a remedy for victims of racial harassment," *Bally* v. *Northeastern Univ., supra*, quoting *O'Connell* v. *Chasdi*, 400 Mass. 686, 694 (1987), and to redress "the derogation of secured rights [that] occurs by threats, intimidation or coercion." *Bally* v. *Northeastern Univ., supra*. See *Batchelder* v. *Allied Stores Corp., supra* at 821 ("The Legislature passed this statute to respond to a need for civil rights protection under State law"). Although the act reaches private actors, *id.* at 821-822, it was not intended to create, nor may it be construed to establish, a "vast constitutional tort." *Bell* v. *Mazza*, 394 Mass. 176, 182 (1985). See *Bally* v. *North-*

---

[15]The plaintiffs also argue that a certain threat made by Robert Duffy at the aborted February 7, 1997, foreclosure sale constituted a "threat" or "intimidation" within the meaning of the act. The testimony of Robert Duffy and of Buster about the incident differed sharply. The judge credited Buster's recollection of the incident as "closer to the mark." He found that, as Robert Duffy drove away from the sale, he drove by Buster and a group of people and "made some sarcastic comment to the effect that it would be too bad if he could not stop his vehicle in time to avoid hitting them." The judge concluded that Robert Duffy did not intend the remark to threaten physical harm, that Buster did not understand it to do so, and that the remark could not "reasonably . . . have been understood in the circumstances as a threat of physical harm." The plaintiffs ask us to determine that that remark was much more ominous than the judge found. After reviewing the record, we conclude that the judge's findings on this issue were not clearly erroneous. See Part 3, *supra.* They were supported by, among other things, the testimony of a third-party witness to the event.

*eastern Univ., supra* at 718. The Legislature "explicitly limited the [act's] remedy to situations where the derogation of secured rights occurs by threats, intimidation or coercion." *Id*. The Legislature intended that even a direct deprivation of a plaintiff's secured rights would not be actionable under the act unless it were accomplished by means of one of these three constraining elements. See, e.g., *Swanset Dev. Corp.* v. *Taunton*, 423 Mass. 390, 396 (1996), quoting *Freeman* v. *Planning Bd. of W. Boylston*, 419 Mass. 548, 565 (1995) ("a direct deprivation of rights, even if unlawful, is not coercive because it is not an attempt to force someone to do something the person is not lawfully required to do").[16]

The act does not define actionable "coercion." However, we have had previous occasion to consider this term as used in the act. We have held that actionable coercion is "the application to another of such force, either physical or *moral*, as to constrain him to do against his will something he would not otherwise have done" (emphasis added). See *Planned Parenthood League of Mass., Inc.* v. *Blake*, 417 Mass. 467, 474, cert. denied, 515 U.S. 868 (1994), quoting *Deas* v. *Dempsey, supra* at 417. It is "the active domination of another's will." *Planned Parenthood League of Mass., Inc.* v. *Blake, supra*, quoting *Delaney* v. *Chief of Police of Wareham*, 27 Mass. App. Ct. 398, 409 (1989). Thus, we have recognized that coercion may take various forms, and we have not limited its scope to actual or attempted physi-

[16]See *Layne* v. *Superintendent, Mass. Correctional Inst., Cedar Junction*, 406 Mass. 156, 158 (1989) (no "threats, intimidation or coercion" under act for prison officials to move prison library to basement, thus temporarily blocking handicapped prisoners' access); *Longval* v. *Commissioner of Correction*, 404 Mass. 325, 333 (1989) (no threats, intimidation, or coercion where prison officials, possibly violating prisoner's rights, failed to hold a hearing and to obtain approval for conditions imposed on prisoner); *Bally* v. *Northeastern Univ.*, 403 Mass. 713, 720 (1989) (no "individualized threat" or "threat of serious harm" alleged and thus no violation of act for school to require random drug testing of athletes); *Benevolent & Protective Order of Elks, Lodge No. 65* v. *Planning Bd. of Lawrence*, 403 Mass. 531, 559-560 (1988) (no violation of act for town to disclose during purchase negotiations with plaintiffs that it could take plaintiffs' property by eminent domain and then to do so); *Pheasant Ridge Assocs. Ltd. Partnership* v. *Burlington*, 399 Mass. 771, 781 (1987) (no "coercion" under act where town's taking of property was done pursuant to legislation and did not force plaintiffs "to do or not to do something otherwise unlawful," even if taking was done in bad faith).

cal force. See *Swanset Dev. Corp.* v. *Taunton, supra* at 396 n.11 (assuming "without deciding the point that coercion which does not involve physical force might violate the [a]ct"); *Freeman* v. *Planning Bd. of W. Boylston, supra* at 566 n.18; *Planned Parenthood League of Mass., Inc.* v. *Blake, supra* at 474. For example, we have suggested that coercion may be found where one party deprives another of rights due under a contract, see *Redgrave* v. *Boston Symphony Orchestra, Inc.*, 399 Mass. 93 (1987), or makes it impossible, due to sexual harassment, for another to continue her employment, *O'Connell* v. *Chasdi, supra*.[17]

The history of the struggle for civil rights that prompted passage of the Massachusetts act, see *Batchelder* v. *Allied Stores Corp., supra* at 821, shows all too clearly that economic pressure may be deployed in any number of commercial settings in the absence of actual or threatened physical force to coerce individuals to forgo the exercise of their secured rights. See, e.g., *Smith* v. *Stechel*, 510 F.2d 1162, 1164 (9th Cir. 1975) (section of Federal statute making it unlawful to "coerce, intimidate, threaten or interfere" was applicable where employer allegedly fired employees for renting apartments to members of minority groups); *United States* v. *Beaty*, 288 F.2d 653, 656 (6th Cir. 1961) (threats to evict tenants-sharecroppers and to refuse to deal with them in good faith if they exercised their right to vote would constitute coercion); *Jones* v. *Boston*, 738 F. Supp. 604, 605 (D. Mass. 1990) (bartender's alleged use of racial slur directed at patron sufficient to state claim under act). Had the Legislature wished to confine the remedial reach of § 11I to

---

[17]Although in *Redgrave* v. *Boston Symphony Orchestra, Inc.*, 399 Mass. 93 (1987), this court merely answered two certified questions, neither of which addressed whether the actual or threatened infliction of economic harm could constitute "coercion" within the meaning of the act, the case has generally been accepted as establishing a foundation for the proposition that actual or prospective "breach of contract" constitutes "coercion" under the act. See, e.g., *Willitts* v. *Roman Catholic Archbishop of Boston*, 411 Mass. 202, 210 (1991); *Bally* v. *Northeastern Univ., supra* at 719. See also *Carvalho* v. *Westport*, 140 F. Supp. 2d 95 (D. Mass. 2001). Sometimes the *Redgrave* case has been characterized as involving a component of actual or threatened physical confrontation, see *Planned Parenthood League of Mass., Inc.* v. *Blake*, 417 Mass. 467, 473-474 n.8, cert. denied, 513 U.S. 868 (1994); *Longval* v. *Commissioner of Correction, supra* at 333, but we have not by that characterization previously limited the reach of the act to economic coercion accomplished only by violence or threats of violence.

actual or threatened physical acts, it knew how to do so. Compare G. L. c. 12, §§ 11H and 11I (civil violation to use "threat, intimidation or coercion" to interfere with secured rights) with G. L. c. 265, § 37 (criminal violation to use "force or threat of force" to interfere with secured rights).

We conclude, then, that in certain circumstances, economic coercion, standing alone, may be actionable under the act. However, we agree with the judge that the injuries claimed by the plaintiffs in *this* case go far beyond any that the Legislature reasonably could have intended the act to redress. Cf. *Redgrave* v. *Boston Symphony Orchestra, Inc.*, 399 Mass. 93, 99 (1987) ("cases within the reason, although not within the letter, of a remedial statute are embraced by its provisions"). The judge correctly reasoned that the defendants' conduct could not "be deemed 'threats, intimidation or coercion' under the [a]ct because the plaintiffs were not pressured to withdraw their appeals as a means of preventing the [n]ote and [m]ortgage from being purchased or the foreclosure complaint from being filed." The defendants were lawfully entitled to foreclose and it made economic sense to do so. Although they were willing to "trade" foreclosure for a deal involving Buster's voluntary dismissal of all appeals, the offer to negotiate on those terms could not be deemed "threats, intimidation or coercion" where the proffered deal potentially put the plaintiffs in a better position than they would have been in relation to a more "disinterested" holder of the mortgage. In the judge's words, "[w]hen a debtor has 'one card left to play,' it is not a violation of the [a]ct for the creditor to be willing to trade something to obtain that card. Nor, if the debtor is unwilling to make that trade, is it a violation of the [a]ct for the creditor to pursue his legal rights." "Generally, by itself, a threat to use lawful means to reach an intended result is not actionable under § 11I." *Sena* v. *Commonwealth*, 417 Mass. 250, 263 (1994).

We have found no violation of the act in cases analogous to this case, where a plaintiff's own conduct provided independent grounds for the defendant to terminate its bargained-for obligations to a plaintiff, thereby causing the plaintiff an economic loss. See, e.g., *Korb* v. *Raytheon Corp.*, 410 Mass. 581, 585

(1991) ("no improper interference with secured rights when an employer fires an at-will employee who has become ineffective" by reason of his speaking out against his company's interest while he was employed as company spokesperson). See also *Willitts* v. *Roman Catholic Archbishop of Boston*, 411 Mass. 202, 210 (1991) ("no improper interference by the defendant with a secured right" where school merely "exercised its discretion under the terms of employment it chose to offer its teachers" and declined to renew teacher's contract). Although we must await subsequent cases to determine more exactly the actionable bounds of economic coercion under the act, economic loss occasioned by a plaintiff's own conduct, such as when the plaintiff defaults on a note and mortgage, is beyond these bounds.[18] The judge did not err in entering judgment against the plaintiffs in their claim pursuant to the act. We turn to the plaintiffs' consumer protection claim.

5. *G. L. c. 93A.* The plaintiffs rely on our holding in *Kattar* v. *Demoulas*, 433 Mass. 1 (2000), for the proposition that the Duffys engaged in unfair or deceptive business practices in violation of the consumer protection act, G. L. c. 93A, § 11, by purchasing the note and mortgage from Moore and foreclosing

---

[18]Nor does the "language and mode of analysis" of *Brunelle* v. *Lynn Pub. Schs.*, 433 Mass. 179 (2001) (*Brunelle II*), aid the plaintiffs' case, as they maintain. In *Brunelle* v. *Lynn Pub. Schs.*, 428 Mass. 512, 519 (1998) (*Brunelle I*), we held that the school committee's refusal to approve the plaintiffs' home schooling plan violated their right to educate their children at home pursuant to G. L. c. 76, § 1. After *Brunelle I* was decided, the parents filed a motion under the act for attorney's fees. *Brunelle II*, *supra* at 181. The main issue in *Brunelle II* was "whether [the] interference [with the parents' secured rights] was effected 'by threats, intimidation or coercion.' " *Id.* at 182-183. We acknowledged that "the statute's coercion requirement is satisfied 'where the *natural effect* of the defendant's actions [is] to coerce [the plaintiffs] in the exercise of [their] rights" (emphasis original). *Id.*, quoting *Redgrave* v. *Boston Symphony Orchestra, Inc.*, *supra* at 100. Nonetheless, we held that the school committee's actions in filing a criminal complaint against the plaintiffs did not constitute coercion within the meaning of the act because, among other things, the criminal complaint "could not, and did not, have an impact on the plaintiffs in the exercise of their right." *Brunelle II*, *supra* at 183. Nothing in our holding or "mode of analysis" permits that case to be read so expansively as to encompass the Duffys' conduct in acquiring the note and mortgage, attempting to negotiate a settlement with the defaulting plaintiffs, and then lawfully filing to foreclose once negotiations broke down.

on the 110 Beaver Street property.[19] The plaintiffs also argue that the Duffys violated G. L. c. 93A by instigating the mayor of Waltham to order an inspection of the 110 Beaver Street property without disclosing their motives for the request. We agree with the judge that, the *Kattar* case notwithstanding, the plaintiffs' c. 93A claims fail.

In *Kattar* v. *Demoulas, supra,* we held that "[t]he relief available under c. 93A is sui generis. It is neither wholly tortious nor wholly contractual in nature, and is not subject to the traditional limitations of preexisting causes of action." *Id.* at 12, quoting *Slaney* v. *Westwood Auto, Inc.,* 366 Mass. 688, 693 (1975). "Legality of [the] underlying conduct is not necessarily a defense to a claim under c. 93A." *Kattar* v. *Demoulas, supra* at 13. The *Kattar* case involved a contract to forbear foreclosure that the defendants breached in retaliation for the refusal of one of the plaintiffs to testify on an unrelated matter. We held that the foreclosure action, lawful in itself, was not only circumscribed by the terms of the contract, but also was prohibited under c. 93A because it was undertaken for motives against public policy — as retribution for the refusal of a witness to testify. *Id.*[20] Here, no contract to forbear foreclosure existed, much less a forbearance contract that was breached in bad faith. That the Duffys initially sought, acquired, and utilized a legitimate competitive advantage to weaken Buster's economic position does not lead to the conclusion that the Duffys acted unfairly or deceptively, particularly where, as we have seen, the plaintiffs' business vulnerabilities were so clearly the result of their own conduct. It has long been noted that the market is a rough and tumble place where a competitor's lack of courtesy, generosity, or respect is neither uncommon nor in itself

---

[19]General Laws c. 93A, § 11, provides, in pertinent part, that any person engaged in trade or commerce may state a civil cause of action against any other person so engaged who uses "an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two." Section 2 declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ."

[20]In connection with an acrimonious family feud, one side of the family had sought to persuade the witness to testify that the other side of the family had paid the witness to "bug" the former's headquarters in reckless disregard for whether such testimony was true. *Kattar* v. *Demoulas,* 433 Mass. 1, 5 (2000). The witness refused to testify.

unlawful. See, e.g., *Spence* v. *Boston Edison Co.*, 390 Mass. 604, 616 (1983); *Melo-Tone Vending, Inc.* v. *Sherry, Inc.*, 39 Mass. App. Ct. 315, 319 (1995) ("For competition and for the rough and tumble of the world of commerce, there is tolerance . . . even though the fallout of that rough and tumble is damage to one of the competitors" [citations omitted]).

Nor do we conclude that the instigation of regulatory action against the 110 Beaver Street property implicates c. 93A. *Id.* The record fails to support the plaintiffs' claim that the mayor would not have ordered 110 Beaver Street inspected if he had been made aware of the Duffys' intention to foreclose on the property. Cf. *Purity Supreme, Inc.* v. *Attorney Gen.*, 380 Mass. 762, 777 (1980), quoting *Lowell Gas Co.* v. *Attorney Gen.*, 377 Mass. 37, 51 (1979) (conduct "may be 'deceptive' if it 'could reasonably be found to have caused a person to act differently from the way he otherwise would have acted' "). There is no dispute that the 110 Beaver Street property was in violation of the fire and safety codes when the Duffys went to the mayor, or that the resulting inspections were proper or accurate.[21] As mortgagees of the property, the Duffys had an obvious, independent, and legitimate business interest in limiting their own liability. They chose a traditional means to do so — having city inspectors determine whether the mortgagor was complying with applicable safety codes. As the judge stated, "[I]f it were a violation of [c.] 93A to solicit governmental action without disclosing all of one's reasons for doing so, the scope of [c.] 93A would be expanded exponentially."

In *Kattar* v. *Demoulas, supra,* we stated that, whether an act is unfair or deceptive "is best discerned 'from the circumstances of each case.' " *Id.* at 14, quoting *Commonwealth* v. *DeCotis,*

---

[21]The plaintiffs maintain that the judge erred in concluding that the defendants were not making "false or fraudulent representations" to the mayor. The fact is that there were fire and safety violations on the property. The Duffys "recognized that [these violations] . . . justified administrative action by the [c]ity." The judge found that "Norman Duffy told the [m]ayor that he believed there were safety violations at 110 Beaver Street, that Buster owned the building, that Buster had not allowed the [f]ire [d]epartment to inspect the building, that children were attending a ballet school on the top floor, and that Buster should be treated like everyone else with regard to matters of compliance." That the Duffys did not disclose all their motives for instigating an inspection does not render their statements fraudulent.

366 Mass. 234, 242 (1974). A judge's determination whether something is an unfair or deceptive practice is a finding of fact and must stand unless clearly erroneous. *Kattar v. Demoulas*, *supra* at 16. We conclude that the judge's dismissal of the c. 93A claim was fully supported by the record.

6. *Interference with contractual and advantageous relations.* The plaintiffs allege that, by purchasing the note and mortgage and by inducing Moore to initiate foreclosure, the Duffys intentionally interfered with the trust's contractual and advantageous relationship with Moore. They argue that Moore was contractually bound *not* to foreclose on the property because he was in breach of contractual obligations to remove certain inventory from the building and that Moore had, in essence, guaranteed the plaintiffs continued forbearance on foreclosure while the plaintiffs sought additional tenants. We affirm the entry of judgment for the defendants on these claims.

Claims of intentional interference with contractual or advantageous relations require a showing that the defendant knowingly and for an improper purpose or by improper means induced a party to breach a contract or not to enter into or continue a business relationship, resulting in damage. See *Swanset Dev. Corp.* v. *Taunton*, 423 Mass. 390, 397 (1996); *G.S. Enters., Inc.* v. *Falmouth Marine, Inc.*, 410 Mass. 262, 272 (1991); *Riseman* v. *Orion Research Inc.*, 394 Mass. 311, 314 (1985).[22] Neither tort is implicated here. First, Goffe's purchase of the note and mortgage did not, as the plaintiffs argue, interfere with any contract between Moore and the plaintiffs. If, as the plaintiffs claim, Moore was in breach of a contractual obligation to remove inventory from the property, the plaintiffs were free to pursue a breach of contract claim against him or to raise the alleged breach as a defense to a foreclosure action. Moore's alleged defalcations did not prevent him from filing to foreclose. Second, it is of no legal consequence that, as the plaintiffs claim, "one of the ways plaintiffs' relationship with [Moore] was advantageous was that [Moore's] tolerance, for the time being, of plaintiffs' debts allowed plaintiffs to pursue their busi-

---

[22]An "advantageous relation" is a "contemplated contract" or prospective business relationship. *ELM Med. Lab., Inc.* v. *RKO Gen., Inc.*, 403 Mass. 779, 787 (1989). Restatement (Second) of Torts § 776B (1979).

ness plan." Moore's patience "for the time being" created neither a contract nor a "contemplated" contract between Moore and the plaintiffs, much less between any successor to Moore and the plaintiffs. Judgments on Counts VII and VIII were properly entered for the defendants.

7. *Discovery rulings.* Finally, the plaintiffs contend that the judge erred in denying their pretrial motions to compel production of twenty-one documents withheld on the basis of the attorney-client privilege or the work-product doctrine. The plaintiffs argue that the disputed documents were not protected by either privilege, or, alternatively, that the defendants waived any privileges with respect to these documents. Additionally, the plaintiffs argue that all of the documents were discoverable or at least should have been reviewed in camera pursuant to what the plaintiffs term "the crime-intentional tort exception" to the attorney-client privilege.

In general, discovery matters are committed to the sound discretion of the trial judge. See, e.g., *Symmons* v. *O'Keeffe*, 419 Mass. 288, 302 (1995). We will uphold discovery rulings unless the appellant can demonstrate an abuse of discretion that resulted in prejudicial error. *Solimene* v. *B. Grauel & Co.*, 399 Mass. 790, 799 (1987). Under these principles, and for reasons we detail below, we conclude that the plaintiffs' arguments with respect to the judge's discovery rulings are without merit.

The plaintiffs challenge the judge's rulings concerning three separate groups of documents: (1) documents authored by the Duffys' corporate counsel; (2) documents discussing wetlands issues; and (3) a letter between the Duffys' corporate and outside counsel. As to the first group, the plaintiffs argue that the documents were not privileged because they did not concern legal work. However, the judge relied on a detailed and item-by-item description of the documents in the Duffys' privilege log, as well as on an affidavit of the Duffys' in-house counsel, which provided further particularities with respect to the documents, to determine that they did concern legal work. Such reliance is within his broad discretion. See *id.*

As to the second group of documents, the judge correctly concluded that four of the six documents were prepared by party representatives (a surveyor and a consultant) and thus

were not discoverable by reason of the work-product doctrine. See Mass. R. Civ. P. 26 (b) (3), 365 Mass. 772 (1974). The plaintiffs argue, however, that any privilege pertaining to all six documents was waived because "the Duffys affirmatively placed their assessment of plaintiffs' flood storage objections at issue." They claim that it was unfair "[t]o permit the Duffys to testify orally to their alleged analysis, without requiring them to produce documents that might have undercut this oral testimony . . . ." We agree with the judge that the defendants' statement in the pretrial memorandum that they were confident they would prevail in the department appeal "hardly constitutes a waiver of the attorney-client privilege or the work product doctrine." To abrogate the attorney-client privilege merely because of a litigant's invocation of a legal position or theory in a pleading "would pry open the attorney-client relationship and strike at the very core of the privilege." *Darius* v. *Boston*, 433 Mass. 274, 280 (2001).

As to the third "group" of documents, a letter between the Duffys' corporate and outside counsel listed on the defendants' privilege log as "Letter with handwritten notes re: City of Waltham Violations," the plaintiffs argue that the letter was not privileged because it did not pertain to a matter about which outside counsel represented the defendants. We see no reason to disturb the judge's finding that the subject of the letter plausibly related to the foreclosure sale, a matter about which the outside firm represented the defendants, rather than the purchase of the note and mortgage only, a matter about which the outside firm did not represent the defendants. There was no error.

Finally, we conclude that there is no merit to the plaintiffs' argument that all twenty-one of the disputed documents fall within what they term the "crime-intentional tort exception" to the attorney-client privilege and the work product doctrine. The flaw in the plaintiffs' argument is that the judge found that the Duffys' actions were motivated by sound business purposes, and thus were neither criminal nor "intentionally tortious" in nature. See part 4, *supra*. Thus, even under the unduly expansive interpretation of the crime-fraud exception urged on us by the plaintiffs, the documents would remain privileged. Cf. *Matter of a Grand Jury Investigation*, 437 Mass. 340, 357, 361 (2002)

("the crime-fraud exception is a narrow one" and "[w]ithout evidence of a crime or fraud, the crime-fraud exception is inapplicable"); *Purcell* v. *District Attorney for the Suffolk Dist.*, 424 Mass. 109, 113 (1997) ("The applicability of the exception, like the existence of the privilege, is a question of fact for the judge").[23]

8. *Goffe's counterclaim.* In the Superior Court action, Goffe's counterclaim alleged that the plaintiffs breached a contract and violated G. L. c. 93A by repudiating a settlement stipulation entered in the Bankruptcy Court.[24] See Part 2 (c), *supra.* Goffe sought an order enjoining the plaintiffs from maintaining any of the claims covered by the stipulation and awarding it money damages, including attorneys' fees and costs. Among his reasons for allowing the plaintiffs' motion for summary judgment on the counterclaim, the judge stated that "equity" prohibited him from enforcing the stipulation. Because we agree that awarding damages to Goffe would have resulted in an unfair windfall, we need not consider Goffe's challenges to the other bases of the judge's decision.

On determining that Buster had reneged on the settlement stipulation, the Bankruptcy Court judge gave Goffe the opportunity to choose between specific performance of the stipulation and relief from the automatic stay. Goffe chose the latter; it requested and received relief from the automatic stay. As a result, Goffe was able to foreclose on the 110 Beaver Street property and, as the Bankruptcy Court judge noted, avoid the additional expense and time that pursuing specific performance of the stipulation would have entailed. Now, Goffe seeks to recover additional damages based on Buster's breach of the stipulation. We agree with the Superior Court judge, however, that Goffe "cannot have it both ways" — Goffe cannot choose to avoid the settlement stipulation and then seek damages for breach of the stipulation. See, e.g., *Coggins* v. *New England*

---

[23]Our conclusion that the judge did not err in denying the plaintiffs' motion to compel discovery of the disputed documents disposes of the plaintiffs' contention that the judge improperly failed to draw an adverse inference against the defendants for withholding documents.

[24]Neither the judge's memorandum of decision nor the parties' briefs address the merits of Goffe's G. L. c. 93A claim and, thus, we do not address this issue.

*Patriots Football Club, Inc.*, 397 Mass. 525, 539 (1986), *S.C.*, 406 Mass. 666 (1990) (once electing to pursue independent claim, plaintiffs could not intervene because they had "chosen their remedy and should not be permitted to undo that choice"); *Dalton* v. *American Ammonia Co.*, 236 Mass. 105, 107 (1920) ("general principle of law that . . . if [plaintiff chooses] to treat the contract as ended or rescinded . . . he could not thereafter consider it subsisting and recover damages for its breach . . . [H]e must accept the consequences of his assent to the repudiation of the contract by the defendant").

We are unpersuaded by Goffe's argument that, when the Bankruptcy Court judge stated that Goffe was entitled to use the stipulation "defensively in State Court," she "clearly intended" to give the Duffys "as much protection as they would have obtained if Buster were ordered to execute notices of dismissal." We agree with the Superior Court judge that the Bankruptcy Court judge's statement did not promise the Duffys any particular outcome in State court, nor did it anticipate the possibility that Goffe would use the stipulation offensively to recover attorneys' fees.

Goffe's reliance on *Ward* v. *American Mut. Liab. Ins. Co.*, 15 Mass. App. Ct. 98 (1983), and *Aerostatic Eng'g Corp.* v. *Szczawinski*, 1 Mass. App. Ct. 141 (1973), is also unpersuasive. In both cases, the defendant was held to have materially breached a contract, thereby relieving the plaintiff of its own duties to perform under the contract. See *Ward* v. *American Mut. Liab. Ins. Co.*, *supra* at 101 (employer materially breached employment contract and, thus, former salesmen were no longer obligated by noncompete clause and were entitled to damages for breach without setoff); *Aerostatic Eng'g Corp.* v. *Szczawinski*, *supra* at 145 (where defendant materially breached construction contract, plaintiff was permitted to cease performance and receive damages without setoff). In this case, Goffe was entitled not only to cease performing its obligations under the settlement stipulation (forbearance, extension of terms and the like), but also to pursue the equivalent of damages without a setoff, that is, foreclosure. The judge did not err in concluding that foreclosure adequately made Goffe whole by, in effect, returning it the very option — foreclosure — that Goffe had bargained away in an effort to end all litigation.

9. *Conclusion.* We affirm the judgment with respect to Counts II, III, VII, and VIII of the plaintiffs' second amended complaint and affirm the orders denying the plaintiffs' reconsideration motion, motion to compel, and two motions to make additional findings of fact and amend the judgment. We also affirm the summary judgment dismissing Goffe's counterclaim.

*So ordered.*