# United States Court of Appeals

## For the First Circuit

No. 08-1106

DAVID MEUSER,

Plaintiff, Appellant,

v.

FEDERAL EXPRESS CORPORATION,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Honorable Michael A. Ponsor, U.S. District Judge]

Before

Torruella and Selya, Circuit Judges,
and Domínguez,* District Judge.

Dan V. Bair, II with whom Lisa Brodeur-McGan and Bordeur-McGan, P.C., were on brief for appellant.
Kathy Laughter Laizure was on brief for appellees.

May 4, 2009

---

*Of the District of Puerto Rico, sitting by designation.

**Domínguez**, **District Judge**. This appeal arises from a complaint filed by David Meuser ("Meuser/Appellant") against Federal Express Corporation ("FedEx") on February 9, 2006, in the Hampshire Superior Court, in the Commonwealth of Massachusetts, alleging violation of the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 149, § 52C, intentional infliction of emotional distress, and discharge in violation of public policy, Counts I, II, and III, respectively. On March 17, 2006, FedEx filed a notice of removal in the United States District Court for the District of Massachusetts on the basis of diversity and federal question jurisdiction.

FedEx filed a motion for summary judgment, on all counts, on September 4, 2007, contending that the facts, even when viewed in the light most favorable to the Plaintiff, could not lead a reasonable jury to conclude that any action was taken against Plaintiff via "threats, intimidation or coercion" as required by the MCRA, and that Plaintiff was not constructively discharged. Meuser filed his opposition to FedEx's motion for summary judgment on October 1, 2007. On December 14, 2007, District Court Judge Michael A. Ponsor, entered a memorandum and order granting summary judgment in favor of FedEx, on Counts I (violation of the MCRA) and III (wrongful termination in violation of public policy).[1] Meuser

---

[1] On December 7, 2007, Plaintiff filed a motion agreeing to dismiss Count II (intentional infliction of emotional distress) of the Complaint, signed by both parties. See Civil Action No. 06CA-

timely filed his notice of appeal on January 14, 2008.

## I.  BACKGROUND

The events underlying this case commenced on October 10, 2002, when Appellant, a FedEx courier since April 1992, noticed fumes in his delivery truck.  Thereafter, Appellant made a visit to the hospital and was out of work for three days as a result of his exposure to the fumes.  Consequently, on October 11, 2002, Meuser filed a worker's compensation claim, and on October 14, 2002, he filed a Safety First Report with FedEx.  Around that same time Meuser, because he was concerned about his exposure and the nature of the fumes, asked his supervisors for the Material Safety Data Sheets ("MSDS") containing the safety information regarding the faulty pump that was believed to have caused the fumes.  On October 21, 2002, he requested that the Occupational Safety and Health Administration ("OSHA") perform an investigation regarding the fumes emanating from his delivery truck.  Appellant further filed a written formal complaint.  OSHA found that the hazard had already been investigated, identified as a leaking pump, and had been corrected; on October 28, 2002 OSHA closed the file.  On January 17, 2003, Meuser wrote to OSHA formalizing a complaint as to FedEx's refusal to provide him the MSDS sheets.  After some time, the MSDS sheets were obtained from the vendor and provided to Meuser on January 24, 2003, after Meuser's return from a two week

---

30042-MAP, Docket No. 35.

vacation. Although OSHA cited FedEx for not having the MSDS on site, no imposition of any monetary penalty was made.

In February 2003, Meuser contracted a respiratory illness and received one-week's leave under the Family Medical Leave Act ("FMLA"). Later in Spring 2003, Meuser's route was changed as part of a comprehensive overhaul of courier assignments, which had been determined since November 2002, but postponed at the request of the drivers. The new route resulted in a larger geographical area, but nonetheless required from Meuser fewer stops per hour.

In April 2003, Meuser requested from his supervisor a replacement truck because the vehicle he was driving was too "dusty." FedEx Senior Manager, Joseph Marotta, suspected that this complaint was merely a tactic to have someone deliver to Meuser, with the requested replacement truck, a package that he had left behind at the station that morning, enabling Meuser to avoid returning to pick up the package and/or being disciplined for leaving the package behind. Consequently, Appellant was provided online counseling, which constitutes the first step in FedEx's progressive discipline process, for failing to take the package on his route.

On or about April 15, 2003, Meuser used his truck dispatch system to send a female courier a communication ("DADS message") in which he accused her of falsifying documents (specifically DEX 17 scans), which is considered a serious offense by FedEx. On April

16, 2003, due to Meuser's use of the dispatch system to make serious accusations against a courier, he was suspended with pay pending an investigation of the incident by the Operations Manager, James Langone. On April 17, 2003, after completion of Langone's investigation, Meuser received documented counseling for his behavior and was sent a copy of FedEx's Acceptable Conduct policy, Section 2-5 in The People Manual.

On September 3, 2003, a FedEx customer on Appellant's route, Mrs. Emily Robertson, complained to FedEx about a late package delivery. Meuser admitted that although the package was mislabeled and misaddressed, he knew the correct delivery address. Nevertheless, since he noticed the mistake at the end of the day it was too late to deliver the package and therefore he classified the package as a "DEX3", a code for "Delivery Exception 3." Said codification is only appropriate when the courier has no knowledge of where to deliver the package.[2] Consequently, there was a delay in the package delivery. After Mrs. Robertson's complaint of the non-delivery of the package, Meuser was instructed by his

[2]The record is undisputed that by coding a package DEX3 and returning it to the station undelivered, a courier represents that he does not know where the address is located and the courier avoids being charged with a service failure for that package. Any claim by Appellant regarding this matter is inconsistent with the record as Appellant, in his deposition, admitted that although he understood that DEX3 was not to be used when a courier knew the location of the address, he disagreed with the policy. Meuser cannot contradict a prior deposition statement via a later sworn testimony. See Torrech-Hernandez v. General Electric, 519 F.3d 41, 47 (1st Cir. 2008).

supervisor to deliver the package early the next morning and to smooth over the matter with the customer. (FedEx considers recipients of packages to be customers). The next morning Meuser alleges that he delivered the package, apologized and conversed with Mrs. Robertson in the spirit of trying to establish a rapport with her. Meuser further alleges that after he left the customer, he thought he had done a great job and understood that Mrs. Robertson was content. Nevertheless, after the delivery, Mrs. Robertson complained to FedEx again and stated that Meuser's comments were unprofessional, that his manner was threatening and that he accused her of possibly causing him to be subsequently fired because of her complaint.[3] Based on this incident, FedEx supervisors shifted Meuser to a different route and placed him on paid investigative suspension. As a result of the investigation, FedEx issued a warning letter to Meuser. Appellant proffers that couriers are almost never removed from their routes unless they have been terminated and that he was removed from his route after seven years with just one customer complaint.

Subsequent to his assignment to the new route, Meuser contacted a number of FedEx customers whom he knew personally and asked them to write to FedEx complaining about FedEx's decision to change his route. Meuser received a second warning letter on

---

[3]According to Appellant's Brief, Mrs. Robertson was asked by Langone to put her complaints, regarding the incident with Meuser, in writing.

September 25, 2003, for involving FedEx customers and for divulging internal FedEx confidential information. Meuser was further informed that his three-day paid investigative suspension was converted into an unpaid suspension. Nevertheless, Meuser continued on his new route with no other changes in pay or benefits.

On November 17, 2003, Meuser submitted two letters to his supervisor, one requesting his personnel file under Mass. Gen. Laws ch. 149, § 52C, and the other asking for a written statement as to why as of that day his personal tuition reimbursement had not been reimbursed. In a meeting held that same day between Meuser, James Langone and Ms. Lisa Patterson, the recently appointed Senior Manager who had minimal knowledge of Meuser's history and no knowledge of the OSHA complaints, Ms. Patterson told Meuser that the letter regarding his tuition reimbursement was disrespectful in tone. During the meeting Ms. Patterson leaned across the table, slammed her hands on the table and "screamed" that "this would not be tolerated." Appellant further alleges that since he was terrified at Patterson's reaction, he withdrew his letter.[4]

Subsequently, Meuser resigned from his position on December 5,

_____

[4]The District Court noted that the record was unclear as to whether Meuser intended to withdraw his tuition letter or his letter requesting his personnel file since he had submitted both letters on November 17, 2003. Nevertheless, the district court being properly cautious assumed that both letters had been withdrawn.

- 7 -

2003.  Appellant claims that he thought he was on the verge of being terminated anyway and had been told by Langone that he would have a positive rehire status.  Nevertheless, one day after submitting his resignation, Meuser learned that he would be ineligible for positive rehire status because of his two warning letters and attempted to rescind his resignation.  FedEx declined to accept his rescission.  Consequently, the employment relationship ended.

This suit, the district court's summary judgment order and Meuser's timely appeal followed.

## II.  ANALYSIS

### A.  Standard of Review

We review the district court's grant of a summary judgment de novo.  See Collazo v. Nicholson, 535 F.3d 41, 44 (1st Cir. 2008).  Nevertheless, "'[w]e may affirm the district court's decision on any grounds supported by the record.'"  Id. (quoting Estades-Negroni v. Assocs. Corp. of N. Am., 377 F.3d 58, 62 (1st Cir. 2004).  In reviewing a grant of summary judgment, this court "constru[es] the record in the light most favorable to the nonmovant and resolv[es] all reasonable inferences in the party's favor."  Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir. 2002).

Summary judgment is appropriate only if, viewing all factual disputes in the light most favorable to the nonmoving party, there

is no genuine issue of material fact that would prevent judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c); Montfort-Rodriquez v. Rey-Hernandez, 504 F.3d 221, 224 (1st Cir. 2007). A genuine issue exists where "a reasonable jury could resolve the point in favor of the nonmoving party." Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000). Once the moving party avers an absence of evidence to support the non-moving party's case, the non-moving party must offer "definite, competent evidence to rebut the motion." Mesnick v. General Electric Co., 950 F.2d 816, 822 (1st Cir. 1991). However, "'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)); see also Lytle v. Household Mfg., Inc., 494 U.S. 545, 554-55 (1990); Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 696 n.6 (1962).

"Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)(citing Rossy v. Roche Prods., Inc., 880 F.2d 621, 624 (1st Cir. 1989); Oliver v. Digital Equipment Corp., 846 F.2d 103, 109-10 (1st Cir. 1988)); see

- 9 -

also <u>Welch</u> v. <u>Ciampa</u>, 542 F.3d 927, 935 (1st Cir. 2008) ("Although we give the nonmoving party the benefit of all reasonable inferences, a party cannot rest on 'conclusory allegations, improbable inferences, [or] unsupported speculation' to defeat a motion for summary judgment.")(quoting <u>McCarthy</u> v. <u>Northwest Airlines, Inc.</u>, 56 F.3d 313, 315 (1st Cir. 1995)). Furthermore, the non-moving party's burden cannot be satisfied with a declaration that "without proper explanation" contradicts his/her prior deposition testimony. See <u>Torrech-Hernandez</u>, 519 F.3d at 47.

## B. Count I: Violation of Massachusetts Civil Rights Act

We agree with the district court's dismissal of Appellant's claim under the MCRA, since there is no evidence in the record to show that FedEx violated the MCRA by interfering with Appellant's rights secured by the Constitution or laws of either the United States or the Commonwealth, by threats, intimidation or coercion. Appellant alleges that summary judgment was improperly entered as to Count I of the Complaint, since the evidence presented demonstrated issues of material fact. We disagree and explain.

The Massachusetts Civil Rights Act, requires a Plaintiff to demonstrate that "(1) his exercise or enjoyment of rights secured by the Constitution or laws of either the United States or the Commonwealth, (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.'" <u>Bally</u> v.

<u>Northeastern Univ.</u>, 532 N.E.2d 49, 51-52 (Mass. 1989)(quoting Mass. Gen. Laws ch. 12, § 11H); <u>see</u> <u>also</u> <u>Andresen</u> v. <u>Diorio</u>, 349 F.3d 8, 14 (1st Cir. 2003); <u>Kelley</u> v. <u>LaForce</u>, 288 F.3d 1, 10 (1st Cir. 2002)("The MCRA provides a cause of action for any person whose rights under the Constitution, federal law, or state law have been interfered with by threats, intimidation, or coercion of another."); <u>Ayasli</u> v. <u>Armstrong</u>, 780 N.E.2d 926, 934 (Mass. App. Ct. 2002); <u>Howcroft</u> v. <u>City of Peabody</u>, 747 N.E.2d 729, 745 (Mass. App. Ct. 2001)("The MCRA creates no substantive civil rights; rather, it provides a mechanism for obtaining relief from the interference, or attempted interference, with rights conferred by Federal or Massachusetts law.") The Supreme Judicial Court has held that the interference or attempted interference must be by threat, intimidation or coercion, defined as follows:

> "[t]hreat" in this context involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm. <u>See</u> <u>Redgrave</u> v. <u>Boston Symphony Orchestra, Inc.</u>, 502 N.E.2d 1375, 1381 (Mass. 1987) (O'Connor, J., dissenting); <u>Delaney</u> v. <u>Chief of Police of Wareham</u>, 539 N.E.2d 65, 71-72 (Mass. App. Ct. 1989) ("acts or language by which another is placed in fear of injury or damage"). Cf. <u>Commonwealth</u> v. <u>Ditsch</u>, 475 N.E.2d 1235 (Mass. App. Ct. 1985) (reasonable apprehension on the part of the recipient of a criminal threat). "Intimidation" involves putting in fear for the purpose of compelling or deterring conduct. <u>See</u> <u>Redgrave</u> v. <u>Boston Symphony Orchestra, Inc.</u>, supra; <u>Delaney</u> v. <u>Chief of Police of Wareham</u>, <u>supra</u> ("creation of fear to compel conduct"). In <u>Deas</u> v. <u>Dempsey</u>, 530 N.E.2d 1239, 1241 (Mass. 1988), we quoted a definition of coercion from

> Webster's New International Dictionary at 519
> (2d ed. 1959): "the application to another of
> such force, either physical or moral, as to
> constrain him to do against his will something
> he would not otherwise have done."  See
> Delaney v. Chief of Police of Wareham, supra
> ("the active domination of another's will").

Planned Parenthood League v. Blake, 631 N.E.2d 985, 990 (Mass. 1994), cert. denied, 513 U.S. 868 (1994)(internal citations modified); see also Davignon v. Hodgson, 524 F.3d 91, 112 (1st Cir. 2008); Davis v. Rennie, 264 F.3d 86 (1st Cir. 2001); Haufler v. Zotos, 845 N.E.2d 322, 335 (Mass. 2006).

Appellant argues that the district court mischaracterized the incidents as "a collection of minor, possibly harassing incidents [which] cannot be sufficient to satisfy the definition of threatening or coercive conduct under MCRA, especially where there is little evidence of any intent by [Appellant's] superiors to intimidate him."  Meuser v. Federal Express Corporation, 524 F. Supp. 2d 142, 148 (D. Mass. 2007).  The facts, considered in the light most favorable to Appellant based on the record before us, are the following:

Appellant alleges that his employment's environment began to deteriorate after he filed the two OSHA complaints relating to the fumes he detected in his truck (October 21, 2002) and requested the MSDS sheets (January 17, 2003).[5]  For example, in mid-January 2003,

---

[5]Meuser contends that he requested the MSDS sheets initially in late October 2002, followed by a formal request at OSHA on January 14, 2003.  Nevertheless, FedEx's tardiness in providing the

Meuser called Marotta, during his morning route, to ask him about the MSDS sheets. Marotta was allegedly abrupt with Meuser and told him that he did not have enough work if he had time to call about the MSDS sheets during his working route hours. Marotta further insinuated that Meuser had created the whole toxic fumes incident of October 2002, in order to lay the foundation for a later suit against FedEx. Furthermore, Meuser contends that the January 2003 OSHA inspection, which resulted in a citation by OSHA for not having the required MSDS sheets on site, fueled Marotta's retaliatory behavior as evidenced by Marotta's comment that "he [Marotta] did not like to lose."[6]

On January 24, 2003, the same day Meuser was provided with the MSDS sheets, Meuser contends that he was subjected to an unscheduled "check ride" by Langone.[7] In April 2003, although all

_____

sheets cannot be considered as a threat, intimidation or coercion as required by the MCRA.

[6]Although Marotta was allegedly abrupt as to Meuser's MSDS call, it should be noted that Meuser was calling Marotta, a senior manager since November 2002, during working hours as to a personal interest, disregarding that "[w]orking time is for work." Republic Aviation Corp., v. N.L.R.B., 324 U.S. 793, 803 n.10 (1945). Furthermore, Marotta's abruptness towards Meuser, his comment regarding Meuser's alleged fabrication of the fumes incident nor the comment that "he did not like to lose," cannot be considered as Marotta trying to interfere or attempt to interfere with any of Meuser's rights by threat, intimidation or coercion.

[7]The record shows that a "check ride" constitutes an accepted method to supervise and evaluate the performance of a courier in compliance with his route duties. The implementation of such a common procedure in a package delivery business cannot be considered as a threat, intimidation or coercion. Employers have

of the couriers' work days were shortened to eight hours, Meuser's route was the only one that was altered to cover a larger area. Meuser alleges that the enlargement of his route caused service failures, delayed deliveries and rolled delivery (freight not delivered) as evidenced by Mrs. Robertson's delayed delivery. Meuser was not given any help notwithstanding his reiterated requests for assistance and despite the fact that it is a known FedEx policy to assist couriers when possible.[8]  On April 16, 2003, due to Meuser's use of the dispatch system to make serious accusations against Deb Dahlgren, a female courier, Meuser was suspended with pay pending an investigation of the incident by his Manager, James Langone.  On April 17, 2003 after completion of Langone's investigation, Meuser received a documented counseling for his behavior towards Deb Dahlgren and was sent a copy of FedEx's Acceptable Conduct policy, Section 2-5 in <u>The People</u>

---

a right to reasonably supervise and evaluate their employees. Furthermore, Langone provided Meuser a favorable review on his "check ride," stating that Meuser had a "solid improvement since [his] last checkride."  App. 165.

[8]Even if, from all the changed routes, Meuser's route was the only one changed to cover a larger area, said business decision, cannot be considered as a threat, intimidation or coercion, towards Meuser. Furthermore, whether or not it was a wise business decision "[c]ourts may not sit as super personnel departments, assessing the merits — or even the rationality — of employers' . . . business decisions."  <u>Mesnick</u>, 950 F.2d at 825.  It is uncontested that although the route and schedule changes were implemented in April 2003, the business decision to change them had been announced in November 2002, but delayed at the request of the couriers until February 2003.

Manual.[9]  On April 18, 2003, during a meeting with Marotta and Langone, Marotta told Meuser, regarding his request for a less dusty vehicle, that "everything [he] was doing was bullshit,'" App. 499.  Furthermore, Marotta made a comment during the meeting that Meuser had somehow made up his February illness.[10]  On August 4, 2003 Meuser filed a request for tuition reimbursement that was not approved until December 5, 2003.[11]  On September 11, 2003, Meuser

---

[9]Meuser's use of the dispatch system to accuse another FedEx employee of falsifying documents was a direct violation of company policy.  Meuser further admitted during his deposition that there was a growing tension between Deb Dahlgren and him regarding their adjacent routes and a lack of willingness on her part to assist Meuser in his area when she had a light workload or was available to do so.  Meuser further admitted that he had never addressed the tension between them and that it was a matter he should have brought to the attention of management but failed to do so.  Moreover, Meuser admitted that he lost his "cool" and had an outstanding "tension" with Deb Dahlgren.  Pursuant to the above factual scenario, the Court cannot conclude that there was any MCRA violation.

[10]The record shows that Appellant recognized Marotta was disciplined for his profanity during their meeting.  Furthermore, neither Marotta's profanity towards Meuser nor his opinion that Meuser had fabricated his illness, rises to level of threat, intimidation or coercion required by the Act.  The fact that Meuser might have found Marotta's opinion intimidating in some way, is irrelevant.  Cignetti v. Healy, 89 F. Supp. 2d 106, 125 (D. Mass. 2000).  "The nature of a 'threat' should be examined from an objective standpoint."  Id.  Hence, "the state of mind of the person threatened is not controlling."  Commonwealth v. DeVincent, 266 N.E.2d 314, 316 (Mass. 1971); see also Planned Parenthood League, 631 N.E.2d at 990 (citing DeVincent, 266 N.E.2d at 316).

[11]On August 4, 2003, Appellant had submitted a request to be reimbursed for tuition for an introductory economics class.  The record shows that there was a misunderstanding as to which courses were eligible for reimbursement.  Consequently, on November 28, 2003, the tuition reimbursement representative sent Appellant a letter explaining the proper requirements of eligibility for

- 15 -

received a routine non-disciplining attendance memorandum from Jim Langone, informing Meuser that over the past twelve (12) months his attendance had been marginal and that his absence the day before, had put him below the company's acceptable rate of 96.9%. It was further recommended that necessary steps should be taken in order to avoid this type of situation and that any further violations would result in the issuance of a written Performance Reminder.[12] In September 2003 Meuser's route was changed due to the incident with Mrs. Robertson. On September 25, 2003, Meuser was issued a second warning letter for contacting a number of FedEx customers, whom he knew personally, and divulging to them confidential information by asking them to write to FedEx complaining about FedEx's determination to assign Meuser to another route. Finally, on November 17, 2003, Meuser met with James Langone and the new Senior Manager, Lisa Patterson, who had minimal knowledge of Meuser's history and no knowledge of his OSHA complaints. Patterson told Meuser that the letter, allegedly requesting a

---

reimbursement. After Appellant corrected his application, he resubmitted his request and the same was approved on December 5, 2003.

[12]Meuser avers that since FedEx counted one of his FMLA leave days (February 14, 2003) as a regular sick day, in the attendance memorandum he received, FedEx interfered or attempted to interfere with his FMLA rights by threats, intimidation or coercion. Since FedEx accepted that the inclusion of that specific day in the memorandum was an error and Appellant admits that he was granted his FMLA leave requests, FedEx's alleged conduct does not rise to the level of threat, intimidation or coercion required under the MCRA.

tuition reimbursement, was disrespectful in tone. During the same meeting, Patterson slammed her hands on the table and "screamed" that "this would not be tolerated." Appellant alleges that since he was terrified at Patterson's reaction, he withdrew the letter. Meuser resigned from his position on November 24, 2003, effective December 5, 2003, after it had been represented by Langone that he was eligible for positive rehire status. However, after learning that having two warning letters in his record made him ineligible for positive rehire status, Meuser attempted to rescind his resignation.[13] Nevertheless, FedEx declined to accept the rescission.

After reviewing the aforementioned incidents and the evidence of record, in the light most favorable to the Appellant, we find that Meuser failed to establish that FedEx's actions, considered individually or together, constituted "threats, intimidation or coercion" within the meaning of the MCRA. Furthermore, we find that the incidents attested to by Appellant do not rise to the

---

[13]Although in Meuser's deposition he stated that his resignation was contingent upon being in a positive rehire status, he admitted that he did not check the policy book in order to make sure that he was in fact eligible for positive rehire status. Meuser further stated that after he submitted his resignation he decided to check if he was eligible for positive rehire status, something Meuser admits he should previously verified. Meuser was advised by Jack Mackin that he was not eligible because he had two active warning letters. Furthermore, nowhere in the record does Meuser state or imply that Langone had purposely deceived him. An employee's ineligibility for rehire status after receiving two active warning letters is uncontested on the record.

level of a threat, defined as "intentional exertion[s] of pressure [that would] make another fearful or apprehensive of injury or harm," nor can they be considered to rise to the level of intimidation defined as "putting in fear for the purpose of compelling or deterring conduct," or coercion defined as "such force, either physical or moral, as to constrain [him] to do against his will something he would not otherwise have done." Planned Parenthood League, 631 N.E.2d at 990; see also Haufler, 845 N.E.2d at 335. Furthermore, even if we disagree with FedEx's personnel or business decisions, a matter on which we take no view, "[c]ourts may not sit as super personnel departments, assessing the merits— or even the rationality— of employers' . . . business decisions." Mesnick, 950 F.2d at 825.

Moreover, we find that the district court correctly determined that "the record is entirely devoid of anything resembling the sort of physical, moral, or economic pressure that courts have found sufficient to support a claim under this statute . . . [especially when] . . . the exception for claims based on non-physical coercion remains a narrow one." Meuser, 524 F. Supp. 2d at 147 (citing Horne, 509 F. Supp. 2d at 115); see also Kennie v. Natural Res. Dep't of Dennis, 866 N.E.2d 983 (Mass. App. Ct. 2007); Buster v. George W. Moore, Inc., 783 N.E.2d 399, 411 (Mass. 2003).

Nevertheless, we shall proceed to examine the only incident that the district court found worthy of extended scrutiny. As

aforementioned, Appellant claims that during his meeting with Patterson he was "threatened, intimidated, and coerced" by her behavior and comments towards him when she slammed her hands on the table and shouted at Meuser. Furthermore, Patterson suggested that his letter had been written by a lawyer, and that if that was the case, he should reflect on it, because his appeal would not be considered. She further explained that if he had acquired an attorney, any further complaints he might have had with FedEx would then have to be dealt between his attorney and FedEx's legal department. Consequently, Appellant alleges that since he was terrified at Patterson's reaction, he "withdrew his letter requesting his Personnel File." Appellant's Br. 18.[14]

Applying the objective standard of a reasonable person "to determine whether [Patterson's] conduct constituted threats,

---

[14]Although Appellant alleges in his brief that Patterson's behavior during the meeting of November 17, 2003 was prompted by his written request for a copy of his personnel file, in his deposition he clearly accepts that the reason for the meeting and her alleged reaction was because of his written tuition reimbursement request. He further states that the letter he wrote to Langone regarding this issue was the one Mrs. Patterson had on her desk when she slammed her hands and stated that it was "disrespectful." App. 168-69. Meuser also testified that Ms. Patterson explained to him that they had already discussed the issue and that Mr. Langone had already explained why he was not eligible for the reimbursement. Once again, Appellant cannot create a question of fact with a later sworn testimony contradicting his prior deposition testimony without proper explanation, which clearly states that the incident was in fact prompted by his request for the tuition reimbursement. See Colantuoni v. Alfred Calcagni & Sons, 44 F.3d 1, 4-5 (1st Cir. 1994); see also Torrech-Hernandez, 519 F.3d at 47.

intimidation, or coercion under the act," Haufler, 845 N.E.2d at 335, we agree with the district court's finding that this type of behavior, "though it approaches the line," fails to constitute the kind of threatening or intimidating behavior the MCRA requires. Meuser, 524 F. Supp. 2d at 148. As aforementioned, the fact that Meuser might have found Patterson's conduct intimidating or threatening in some way, is irrelevant. Cignetti, 89 F. Supp. 2d at 125. "[T]he state of mind of the person threatened is not controlling," it is whether a reasonable person in Appellant's circumstance would feel threatened, intimidated or coerced by Ms. Patterson's conduct. Commonwealth v. DeVincent, 266 N.E.2d 314, 316 (Mass. 1971); see also Planned Parenthood League, 631 N.E.2d at 990 (citing DeVincent, 266 N.E.2d at 316).

> The Legislature "explicitly limited the [act's] remedy to situations where the derogation of secured rights occurs by threats, intimidation or coercion." The Legislature intended that even a direct deprivation of a plaintiff's secured rights would not be actionable under the act unless it were accomplished by means of one of these three constraining elements.

Buster, 783 N.E.2d at 409 (internal citations omitted). Consequently, we find using an objective standard, that Patterson's conduct of slamming her hands on the desk and allegedly shouting at Meuser cannot be considered in any way within the context of the act as either a threat, intimidation or coercion. See Haufler, 845 N.E.2d at 335; see also Cignetti, 89 F. Supp. 2d at 125.

Moreover, we emphasize that Patterson had replaced Mr. Marotta as the senior manager of Hatfield, only two weeks prior to the incident. It is uncontested that Patterson had minimal knowledge of Meuser's employment history at FedEx and no knowledge of the fumes-related OSHA incident. Consequently, there is no evidence that she was tainted by Appellant's OSHA complaints, which is the motivating factor alleged by Meuser under the MCRA. Hence, the short-lived incident of slamming her hands on the desk, cannot be linked with Meuser's exercise of other statutory rights. See Carmack v. Amtrak, 486 F. Supp. 2d 58, 92 (D. Mass. 2007)("Nothing in the record indicates that Amtrak's true motivation was to punish Mr. Carmack for communicating with his union representative or for exercising his right to free speech."); Fletcher v. Szostkiewicz, 190 F. Supp. 2d 217, 232 (D. Mass. 2002) (criticizing a "pattern of harassment" as a possible basis for a finding of threatening behavior).

Therefore, we conclude that the district court did not err in dismissing Appellant's claim under MCRA.

## C. Count III: Wrongful Termination in Violation of Public Policy

We agree with the district court's dismissal of Appellant's common law claim for discharge in violation of public policy.

Appellant alleges that the district court improperly entered summary judgment on Count III since the record shows that he was subjected to a sustained campaign of harassment and retaliation

from October 2002 until his resignation on November 24, 2003. Appellant further alleges that although he requested to return to work at FedEx, his amenability was predicated upon a future change in management. Moreover, Meuser avers that his resignation was submitted with the assumption that he was eligible for re-hire.

"Massachusetts courts recognize an exception to the general at-will employment rule 'when employment is terminated contrary to a well-defined public policy.'" Day v. Staples, Inc., 555 F.3d 42, 59 (1st Cir. 2009)(quoting Wright v. Shriners Hosp. for Crippled Children, 589 N.E.2d 1241, 1244 (Mass. 1992)); see also GTE Products Corp. v. Stewart, 653 N.E.2d 161, 168-69 (Mass. 1995). "For example: Redress is available for employees who are terminated for asserting a legally guaranteed right (e.g., filing workers' compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g., committing perjury)." Hinchey v. NYNEX Corp., 144 F.3d 134, 145 (1st Cir. 1998)(citing Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch., 533 N.E.2d 1368, 1371 (Mass. 1989)). Nevertheless, "[t]his public policy exception is construed narrowly." Day, 555 F.3d at 59 (citing King v. Driscoll, 638 N.E.2d 488, 492 (Mass. 1994)). "[T]o do otherwise would 'convert the general rule . . . into a rule that requires just cause to terminate an at-will employee.'" King, 638 N.E.2d at 492 (quoting Smith-Pfeffer, 533 N.E.2d at 1371).

As aforementioned, Appellant contends that he was constructively discharged due to a sustained campaign of harassment and retaliation from October 2002 until his resignation on November 24, 2003. Nevertheless, it has been well established in this Circuit that

> [t]o prove constructive discharge, a plaintiff must usually show that [his] working conditions were so difficult or unpleasant that a reasonable person in [his] shoes would have felt compelled to resign. It is not enough that the plaintiff suffered the ordinary slings and arrows that workers routinely encounter in a hard, cold world.
>
> In order to establish constructive discharge, [Plaintiff] must show that conditions were so intolerable that they rendered a seemingly voluntary resignation a termination. In such cases, [t]he question is not whether working conditions at the facility were difficult or unpleasant, but rather, an employee must show that, at the time of his resignation, his employer did not allow him the opportunity to make a free choice regarding his employment relationship. Thus, in order for a resignation to constitute a constructive discharge, it effectively must be void of choice or free will.

Torrech-Hernandez, 519 F.3d at 50 (internal citations and quotations omitted) (quoting De La Vega v. San Juan Star, Inc., 377 F. 3d 111, 117 (1st Cir. 2004); see also GTE Products Corp., 653 N.E.2d at 168-69 ("'[T]he trier of fact must be satisfied that the new working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' The test is met if, based on an objective

- 23 -

assessment of the conditions under which the employee has asserted he was expected to work, it could be found they were so difficult as to be intolerable." (quoting Alicea Rosado v. Garcia Santiago, 562 F.2d 114, 119 (1st Cir.1977))); Vega v. Kodak Caribbean, Ltd., 3 F.3d 476, 481 (1st Cir. 1993); Aviles-Martinez v. Monroig, 963 F.2d 2, 6 (1st Cir. 1992); Pena v. Brattleboro Retreat, 702 F.2d 322, 325 (2d Cir. 1983)).

We briefly explain our analysis as to why Plaintiff's allegations regarding his FedEx working conditions do not rise to the level of intolerableness which would compel a reasonable person in his position to resign. Plaintiff was in fact able to file his two OSHA related complaints and he did not have any further related OSHA complaints. Meuser admits that he applied and was granted leave pursuant to the FMLA. Therefore, the fact that one day of his FMLA leave was erroneously counted in a non-disciplinary letter, recognized by the employer as an error, was not "'so difficult or unpleasant that a reasonable person in [his] shoes would have felt compelled to resign.'" GTE Products Corp., 653 N.E.2d at 168-69 (quoting Alicea Rosado v. Garcia Santiago, 562 F.2d 114, 119 (1st Cir. 1977)). The "dusty truck" incident resulted in a documented counseling without any suspension; it was not unreasonable for the employer to opine that he used the "dusty truck" to camouflage a failure in his services (leaving a package behind). The "DADS" usage by Meuser to send an offensive message

to a female courier co-worker, regarding an issue that occurred a year earlier, resulted in a documented counseling for using an employment related communication instrument that could not be used for that purpose. Furthermore, Meuser admitted that he had a grudge against the female worker and that he "lost his cool." Hence, Meuser could not be affected to the point of "intolerable" work environment. Moreover, the tuition reimbursement was in fact a fringe benefit which was alerted to him by management, Mr. Langone, during a routine "check ride." Meuser had not stated in the request that the reimbursement was for a graduate course. He modified the request and the reimbursement was granted after the company verified that "economics" was related to his employment. Even if there was fault in initially denying the reimbursement, it is not a matter compelling resignation. The change of Meuser's route, and of all the other couriers', was a business decision determined in November 2002, prior to other work-related incidents, and implemented after he returned from FMLA leave, during April 2003. Meuser alleged that the order was a reprisal for Meuser requesting the MSDS sheets in January 17, 2003, while he was delivering packages. Nevertheless, it is uncontested on the record that the decision to change the routes as to all the couriers was made on November 2002 and postponed for a later date at the request of the couriers. The alleged "check ride" reprisal resulted in no disciplinary action whatsoever, it constituted a valid traditional

manner to check courier performance, and resulted in a positive evaluation for Meuser. Hence, Meuser cannot seriously allege that the "check ride" was so "unpleasant" to the point of compelling him to resign. Finally, the most significant disciplinary action, wherein Meuser was suspended, was caused by Meuser's own conduct. Appellant recruited and involved FedEx customers relating to the disciplinary action taken by FedEx against Meuser due to the incident with Mrs. Robertson, a FedEx client. The customers were recruited by Meuser in an effort to persuade FedEx to rescind the disciplinary action of changing his route. The communication of Meuser with FedEx customers was thus not authorized and further revealed inside information to clients.

After a thorough review of the record, we are in agreement with the district court's finding that "[n]othing in the record of this case would justify a jury in reasonably concluding that Plaintiff's working conditions reached anything approaching the level of [intolerableness] required to provide a basis for a claim of wrongful discharge." Meuser, 524 F. Supp. 2d at 149. Furthermore, we find that the fact that Meuser attempted to rescind his resignation, after he learned that he was not eligible for positive rehire status as he originally thought, is clear evidence that Meuser's working conditions were not "so difficult or unpleasant that a reasonable person in [his] shoes would have felt compelled to resign,'" GTE Products Corp., 653 N.E.2d at 169

(quoting <u>Alicea Rosado</u>, 562 F.2d at 119), and that he had "the opportunity to make a free choice regarding his employment relationship." <u>Torrech-Hernandez</u>, 519 F.3d at 50. In other words, his resignation was not "effectively . . . void of choice or free will." <u>Id.</u>

### III.   CONCLUSION

For the reasons stated herein we affirm the district court's decision since as the district court eloquently stated, "it would be false charity to permit this case to go forward where the record is simply inadequate as a matter of law to support the claims." <u>Meuser</u>, 524 F. Supp. 2d at 149.


**Affirmed.**